IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHI MING CHAO,<br><br>a/k/a "Jimmy Chao,"<br><br>Defendant. | **UNDER SEAL**<br><br>Case No. 1:25-MJ-216 |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Christopher D. Silva, being duly sworn, depose and state:

## INTRODUCTION

1. I make this affidavit in support of a criminal complaint and application for an arrest warrant for Chi Ming "Jimmy" Chao for conspiracy to violate the Export Control Reform Act of 2018 (ECRA), 50 U.S.C. § 4819.

2. Chao is a New Jersey resident and the owner of Biominer LLC (Biominer), a New Jersey refurbished lab equipment dealer and service provider. As described below, there is probable cause to believe that, since 2022, Chao has ordered scientific equipment from U.S. suppliers on behalf of Russian customers and exported it to Russia, often by transshipping it through Kazakhstan and Turkey, without the required BIS export license. To deflect suspicion, Chao ordered some of this equipment using the name of and an email address purporting to belong to the CEO of a New Jersey biopharmaceutical research services company and falsely stated that the end users of the equipment were located in Kazakhstan and Turkey, not Russia.

1

## AGENT BACKGROUND

3. I have served as a Special Agent with the U.S. Department of Commerce (DOC), Bureau of Industry and Security (BIS), Office of Export Enforcement (OEE) since July 2020 and am currently assigned to the OEE Washington Field Office in Herndon, Virginia. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center. As a Special Agent with OEE, my duties include investigating violations of the law relating to the export of controlled commodities and technology from the United States, as established by the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801 et seq., and its implementing regulations, the Export Administration Regulations (EAR), 15 C.F.R. Parts 730 through 744. My primary responsibility is investigating crimes involving the export of certain manufactured "dual-use" commodities, that is, commodities that can be used for both commercial and military purposes. Through my training and experience I am familiar with the export-control laws of the United States, and the means and techniques used by individuals and companies who engage in violations of these laws.

4. The information set forth in this affidavit is based on my personal knowledge, that of other law enforcement agents (specifically of the U.S. Department of Homeland Security, Homeland Security Investigations (HSI)), public records, and other sources as indicated herein. In addition, I have reviewed documents obtained during the investigation. Since this affidavit is being submitted for the limited purpose of securing the requested warrant, I have not included every fact known to me concerning this investigation, and have set forth only those facts relevant and necessary to establish probable cause.

## APPLICABLE CRIMINAL LAW

5. ECRA provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811(2). To that end, ECRA authorizes the President "to control (1) the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. 50 U.S.C. § 4812(a). ECRA further authorizes the Secretary of Commerce to establish the applicable regulatory framework. 50 U.S.C. § 4813(a).

6. Under ECRA, the DOC controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR. In particular, the EAR restricts the export of items that could significantly contribute to the military potential of other nations or that could harm U.S. foreign policy or national security. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

7. The EAR regulate the export of "dual use" items, that is, items that have both a commercial application and a military or strategic use. *See* 15 C.F.R. § 730.3. The EAR limit the export of goods and technology that could enhance foreign military capabilities, jeopardize U.S. national security, or undermine U.S. foreign policy goals. The EAR place requirements on exporters and include a list of products, commodities, and items for which an export license is required. *See* 15 C.F.R. Part 744.

8. Whether an item requires an export license depends in part on what country the item is being exported to, who the end-user of the item is, and what the end-user intends to use the item for. The EAR expressly require a license applicant to disclose the names and addresses of all parties to a transaction, including the applicant, purchaser, intermediate consignee(s) (if any), ultimate consignee, and end-user. *See* 15 C.F.R. §§ 748.4(b), 748.5. Certain applications must be supported by documents designed to elicit information concerning the disposition of the items intended for export. *See* 15 C.F.R. § 748.9(b).

9. In response to the Russian Federation's invasion of Ukraine in February 2022, and to protect U.S. national security and foreign policy interests, the DOC BIS amended the EAR to impose additional controls for exports to Russia (collectively referred to as the EAR Russia Sanctions). In March 2022, BIS imposed additional license requirements for exports, reexports, and transfers to or within Russia of any items subject to the EAR that are identified under certain Schedule B or Harmonized Tariff Schedule 6 (HTS) numbers/codes. *See* 87 Fed. Reg. 12,856 (Mar. 8, 2022); 15 C.F.R. Part 746, Supp. No. 4. HTS codes take their first six digits from the corresponding Harmonized System (HS) code, a standardized numerical method of classifying traded products used by customs authorities around the world.

10. Under ECRA, "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this part or of any regulation, order, license, or other authorization issued under this subchapter," including the EAR. 50 U.S.C. § 4819(a)(1). ECRA also lists specific unlawful acts, including:

    a. "No person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by this subchapter, the Export Administration

4

Regulations, or any order, license or authorization issued thereunder." 50 U.S.C. § 4819(a)(2)(A).

b. "No person may cause or aid, abet, counsel, command, induce, procure, permit, or approve the doing of any act prohibited, or the omission of any act required by this subchapter, the Export Administration Regulations, or any order, license or authorization issued thereunder." 50 U.S.C. § 4819(a)(2)(B).

c. "No person may conspire or act in concert with one or more other persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of this subchapter, the Export Administration Regulations, or any order, license or authorization issued thereunder." 50 U.S.C. § 4819(a)(2)(D).

d. "No person may make any false or misleading representation, statement, or certification, or falsify or conceal any material fact, either directly to the Department of Commerce, or an official of any other United States agency, including the Department of Homeland Security and the Department of Justice, or indirectly through any other person— ... (ii) in connection with the preparation, submission, issuance, use, or maintenance of any export control document or any report filed or required to be filed pursuant to the Export Administration Regulations; or (iii) for the purpose of or in connection with effecting any export, reexport, or in-country transfer of an item subject to the Export Administration Regulations or a service or other activity of a United States person described in section 4813 of this title." 50 U.S.C. § 4819(a)(2)(F).

e. "No person may engage in any transaction or take any other action with intent to evade the provisions of this subchapter, the Export Administration Regulations, or any order, license, or authorization issued thereunder." 50 U.S.C. § 4819(a)(2)(G).

11. "A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in [50 U.S.C. § 4819](a) shall" be guilty of a crime. 50 U.S.C. § 4819(b).

## PROBABLE CAUSE

### *Background*

12. According to my training and experience, prior BIS investigations have revealed that procurement agents have exploited U.S. export laws by arranging for items to be first exported to a country or company that does not have the same licensing requirements as the actual end user. Subsequently, these items are then illicitly re-shipped to a country or company, like Russia and other sanctioned entities, that would normally require a BIS export license.

13. According to the BIS, the countries that closely border Russia including Kazakhstan, Turkey, Uzbekistan, Tajikistan, Finland, and Kyrgyzstan are known transshipment points for goods destined for Russia, based both on their proximity to Russia and the relative ease with which items are re-exported without scrutiny. The scheme typically occurs as follows: goods are shipped from the United States to the neighboring countries, but once the goods arrive, they are re-shipped to Russia, sometimes immediately. This arrangement permits the true Russian end-user to evade the various U.S. export controls and sanctions limiting current trade with Russia.

14. U.S. Company 1 is a limited liability company registered in Wilmington, Delaware. According to open-source Delaware business records, the Delaware office space is a virtual office space that hosts 227 different companies. The company's "doing business address" and shipping

address are both in Chantilly, Virginia. These records indicate that the company was founded by Individual 1 and incorporated in June 2016. The company purports to be a "scientific equipment supplier." However, the company does not identify any ownership or officers or have a social media page. No employees for the company were identified on LinkedIn or any other open-source pages. The company also does not have a retail website from which customers can make purchases. A search of the email accounts described below revealed that most of the invoices addressed to U.S. Company 1 use the Virginia address for shipping purposes and the Delaware office for billing purposes.

15. U.S. Company 2 was incorporated in Delaware in 2019, and in Texas in October 2022. Through law enforcement interviews and material obtained via legal process, the investigative team has determined that U.S. Company 2, specifically the Texas corporation, was controlled and operated by Individual 1's brother (Individual 2), who listed his wife (Individual 3) as the owner of the corporation. Individual 1 and Individual 2 utilized U.S. Company 2 as a front company to procure scientific goods from U.S. vendors in place of U.S. Company 1 who was frequently being "blacklisted" by U.S. companies unwilling to sell to U.S. Company 1. Once U.S. Company 2 interfaced with the vendor to procure the product, U.S. Company 1 would then "purchase" the goods on paper and wire money to U.S. Company 2's accounts. In approximately December 2022, Individual 3's name was removed from the corporation ownership.

*Biominer's Export History*

16. According to open-source research, Biominer, a U.S.-based company headquartered in New Jersey, is a refurbished lab equipment dealer and service provider owned by Chao. The business address listed online for the company is 233 Madison Street, Lyndhurst, New Jersey 07071.

7

17.     According to U.S. government export records, Biominer exported approximately 35 shipments from the United States between September 2021 and October 2024.[1] According to Biominer's EEI filings in AES, the company listed 126 Metlars Lane, Piscataway, New Jersey 08854 as its address seven times, and 26 times listed 233 Madison Street, Lyndhurst, New Jersey 07071, a residence that Chao purchased in 2010 and currently owns, according to New Jersey tax records. On October 1, 2024, HSI conducted surveillance at the Lyndhurst address and observed a vehicle registered to Chao departing the driveway.

18.     According to AES records and a review of emails, Biominer utilized a freight forwarding company based in Sterling, Virginia, for ten of its shipments overseas during this time. The Sterling, Virginia, freight forwarder would dispatch drivers in New Jersey to retrieve the packages and deliver them to the nearest international airport.[2] Chao provided the Sterling, Virginia freight forwarder with a Shipper's Letter of Instruction (SLI) that identified the ultimate consignee for the shipment, its dimensions, and a description of the commodities, including any export control or license requirements. This particular SLI used by the Sterling, Virginia, freight forwarder advised customers—like Chao—that the "Ultimate Consignee is NOT an intermediate consignee" nor "the destination customs broker or destination freight forwarder," and that all exports to Russia at the time required an EEI filing and ECCN identification. Shipping labels and

---

[1] Federal regulations require exporters, shippers, and freight forwarders to file certain forms and declarations concerning exports of goods and technology from the United States. 15 C.F.R. § 30.9. Typically, those forms are filed electronically in a system called the Automated Export System (AES); the information submitted through AES is known as Electronic Export Information (EEI). The EEI includes basic information about the export, including the ultimate consignee and country of ultimate destination, and is equivalent to a statement to the United States Government that the transaction occurred as described.

[2] For the remaining 25 shipments, Biominer used other freight forwarders.

shipping receipts list the date that the shipments were picked up and list the pickup location as either Biominer's Piscataway, New Jersey address or Chao's Lyndhurst, New Jersey address.

*Biominer's Exports to Russian Company 1/Russian Company 2
Before the EAR Russia Sanctions*

19. All six shipments that Biominer exported immediately before the Russian invasion of Ukraine and the implementation of the EAR Russia Sanctions in February 2022 were to a company in Moscow, Russia (Russian Company 1). Emails with individuals affiliated with Russian Company 1 obtained via search warrant indicate that Russian Company 1 is the same company as or closely related to another Russian company (Russian Company 2). As one example, in a March 2023 email, the sender used a signature block listing his positions with both Russian Company 1 and Russian Company 2. As a second example, in an August 2023 email, a sender with an email address ending in "@[Russian Company 2].ru" used a signature block listing his position with Russian Company 1. According to my review of emails and open-source information, Russian Company 1 and Russian Company 2 are located at an address in Moscow, Russia.

20. Emails obtained via search warrant include a Russian Company 1 contract listing Russian Company 1's address as the same address for Russian Company 2. The contact information listed for Russian Company 1 on this contract includes two individuals with "@[Russian Company 2].ru" email addresses and one individual with an email address at a similar variant of that domain.

21. According to Russian Company 2's website, the company was established by "a group of specialists experienced in delivery and servicing of high-technology scientific equipment for over 10 years." According to the Russian Unified State Register of Legal Entities, the records

9

of which are publicly available online, Russian Company 2 was registered in Russia on October 22, 2013. Based on my review of emails obtained via search warrant, Individual 1 signs emails as "Director" on behalf of Russian Company 2. He also signs contracts on behalf of the company.

22. Chao received an email in January 2025 from the head of the Russian Company 2 logistics department with an attached contract between Russian Company 1 and Biominer for Chao's signature. The contract, which was written in both English and Russian, listed Biominer's address as Chao's Lyndhurst, New Jersey address and Russian Company 1's address as a location in Moscow, Russia. The contact information listed for Russian Company 1 included Individual 1, three individuals with "@[Russian Company 2].ru" email addresses, and two individuals with email addresses at a similar variant of that domain. Under the contract, which whose effective date ran from January 2022 through January 2023,[3] Biominer agreed to sell goods to Russian Company 1 based on Russian Company 1's orders.

23. The six shipments from Biominer to Russia before the implementation of the EAR Russia Sanctions, all of which used Chao's Lyndhurst, New Jersey address as the shipper's address, are depicted in the chart below:

| Date of Export | Company | Country | Shipper's Address |
| --- | --- | --- | --- |
| 2/18/2022 | Russian Company 1 | Russia | 233 MADISON ST |
| 12/20/2021 | Russian Company 1 | Russia | 233 MADISON ST |
| 12/2/2021 | Russian Company 1 | Russia | 233 MADISON ST |
| 11/10/2021 | Russian Company 1 | Russia | 233 MADISON ST |
| 10/20/2021 | Russian Company 1 | Russia | 233 MADISON ST |
| 9/9/2021 | Russian Company 1 | Russia | 233 MADISON ST |

---

[3] The purpose of this January 2025 email and contract appears to be to post-date and formalize the 2022 through 2023 contract period between Biominer and Russian Company 1.

*After the EAR Russia Sanctions, Biominer Stops Exporting to Russia and Starts Exporting to Kazakhstan*

24. After the EAR Russia Sanctions took effect in February 2022, an export license was required to send certain scientific equipment to Russia. After this date, Biominer ceased shipping to Russia and began shipping to a Kazakhstan-based company (Kazakh Company 1) instead. According to Kompra.KZ, an open-source website that tracks Kazakhstani business registrations, Kazakh Company 1 became a registered business on March 2, 2022, about a week after the EAR Russia Sanctions took effect. According to my review of emails obtained via search warrant, many Kazakh Company 1 business contracts list Individual 1 as the Director of the business, just as his email signature describes him as Director of Russian Company 2 in Russia.

25. Kazakh Company 1 had no recorded shipments in AES before the EAR Russia Sanctions took effect. Further, according to AES records, the types of goods that Biominer exported to Kazakh Company 1 after the EAR Russia Sanctions took effect remained consistent with the company's pre-sanctions shipments to Moscow that now required a license to ship to Russia due to the export restrictions, as detailed below. However, Kazakhstan was not subject to the BIS export restrictions on Russia, and Biominer identified the ultimate end user of the goods as Kazakh Company 1 in Kazakhstan, which, if true, would have meant that these subsequent exports did not require a license.

26. According to Biominer's AES filings, Biominer exported to Kazakh Company 1 17 times between May 25, 2022, and September 7, 2023, with the shipper's address for 15 of the exports listed as either Biominer's Piscataway, New Jersey address or Chao's Lyndhurst, New Jersey address. According to AES data, these shipments contained lab reagents, laboratory ware, and an applied biosystem analyzer.

11

*Russian Company 2 and U.S. Company 1 Continued to Order Scientific Equipment from Biominer and Created Invoices Falsely Saying the Orders were for Kazakh Company 1*

27. Although the EAR Russia Sanctions took effect in February 2022, and Biominer ceased listing Russia as the country of ultimate destination in EEI filed after that date, Chao, the owner of Biominer, continued to receive emails after that date from Russian Company 2 employees requesting invoices and pricing for chemicals and scientific equipment. For example, in April 2022, a Russian Company 2 employee (Russian Company 2 Employee) emailed Chao requesting an invoice for a list of scientific equipment and materials. The subject line of the email was "New order Biominer30," which referred to that specific order. Based on my review of the emails, it appears that each order placed by Russian Company 1/Russian Company 2 with Biominer was assigned a unique invoice number to differentiate between orders.

28. The same scientific equipment and materials that Russian Company 2 Employee requested from Chao in the above email were ordered several months later through a commercial invoice between Biominer, U.S. Company 1, and Kazakh Company 1. Specifically, in December 2022, Chao emailed U.S. Company 1 about several orders, including "O[r]der 30," and attached two documents with Russian Company 1's name and "Packing list" in the file names. One attachment contained a "Commercial Invoice" from Kazakh Company 1 for the same items listed in Russian Company 2 Employee's April 2022 email.

*Chao Knew That Orders and Correspondence with Russian Company 2 Came from the U.S. Company 1 Gmail Account*

29. Emails obtained via search warrant show that U.S. Company 1, using a Gmail account (the U.S. Company 1 Gmail account), and Russian Company 2 — specifically, Russian Company 2 Employee — both continued to email Chao to order scientific equipment until November 2022. In November 2022, Russian Company 2 Employee again emailed Chao, copying

12

the U.S. Company 1 Gmail account, and advised him that future orders and requests would come from the U.S. Company 1 Gmail account. Russian Company 2 Employee asked Chao to send all information to that email address.

30. Search warrant returns for the U.S. Company 1 Gmail account include internet protocol (IP) address data showing the geographic location where the account was accessed on certain occasions, which was often in Russia. For example, the IP address for an email sent by the U.S. Company 1 Gmail account on March 1, 2024, was 46.242.11.217. According to iplocation.net, a publicly available IP address geolocation tool, this IP address resolves to Moscow, Russia.

31. Emails obtained via search warrant show that the U.S. Company 1 Gmail account did indeed email Chao to request scientific goods, and that in many cases, Russian Company 2 Employee was the person doing the ordering. As an example, in early February 2023, another employee of Russian Company 2 emailed Russian Company 2 Employee requesting that she check the prices for two parts with specific item numbers from Biominer specifically. The next day, the U.S. Company 1 Gmail account emailed Chao asking for the prices those same specific parts, and Russian Company 2 Employee separately responded to her colleague confirming that she had sent the request. Several weeks later, after Russian Company 2 Employee followed up with Chao, he advised her that he could not find the correct manufacturer for those parts using the item numbers.

32. As a second example, the U.S. Company 1 Gmail account emailed Chao in March 2023 requesting a price for a piece of scientific equipment from a U.S. supplier, then requesting a quote for the item from the U.S. supplier. Chao responded that he had gotten a paper quote and attached screenshots of the quote. The attached quote included a warning about U.S. export control laws: "These items are controlled by the U.S. Government and authorized for export only to the

13

country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any other person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations."

33. As a third example, in mid-May 2023, the U.S. Company 1 Gmail account and Chao corresponded about "New order Biominer54." In order to provide a quote for one particular product, Chao informed the U.S. Company 1 Gmail account that the U.S. supplier wanted "to know the end user info and country in order to quote…" The U.S. Company 1 Gmail account responded, "I suppose that I can't provide the real S/N. Maybe you can find some S/N in the USA?" Chao relied, "I believe they are tracking the end user."

34. As another example, in July 2023, the U.S. Company 1 Gmail account emailed Chao requesting a proforma, which is a preliminary bill or quote sent to a buyer before the sale is finalized, for a list of specific scientific equipment. The subject line of the email is "New order Biominer-58." This email chain includes an attachment with a file name containing Russian Company 1's name and ending in "-58," which is an invoice for this equipment between Biominer and Kazakh Company 1 dated June 2023.

35. Emails obtained via search warrant also include another attachment with "Biominer-58" as part of the file name. This document is an invoice between Kazakh Company 1 and Russian Company 2 dated December 2023, listing Kazakh Company 1 as the seller, Russian Company 2 as the buyer, and Russian Company 2's Moscow address as the "ship to" address. According to an online Russian-to-English translation tool, the items listed in this invoice are the same as the items listed on the June 2023 invoice between Biominer and Kazakh Company 1,

including the same part numbers. The part numbers in both documents are also the same part numbers in the July 2023 email from U.S. Company 1 to Chao.

36.    According to records from Import Genius, a company that maintains international trade data, Kazakh Company 1 sent three shipments that arrived in Moscow, Russia in September and November 2023. These records show that the trademark listed for one shipment is the name of the U.S. vendor with whom Chao corresponded about purchasing scientific equipment in Paragraphs 33, 34, and 35 above.

### *U.S. Company 1 Instructed Chao to Stop Exporting to Kazakhstan and Start Exporting to Turkey*

37.    In September 2023, the U.S. Company 1 Gmail account emailed Chao that, due to "problems with bank transfer from Kazakhstan," Chao was to cease shipping to Kazakhstan (i.e., Kazakh Company 1) and to begin shipping instead to a company in Turkey. According to my review of the emails, this appears to be the first mention of a Turkish company being involved with the procurement chain in this case. The same day, Chao replied to acknowledge the change in shipping destination.

38.    Also on the same day, the U.S. Company 1 Gmail account emailed Chao directing him to send future orders to a company at an address in Istanbul, Turkey (Turkish Company 1).

39.    According to an internet search by HSI, Turkish Company 1's website appears to be generic in nature and has sub-pages titled, in Turkish, "bioanalytical laboratory," "pharmaceutical analysis," and "clinical laboratory diagnosis." The photographs of scientific items on the website are generic stock images, according to Google reverse-image searches for those photos, and are available online and shared across many other websites. Although the site claims that Turkish Company 1 has participated in "more than five hundred studies of bioequivalence and

15

pharmacokinetics of drugs," the website does not link to any published studies, other laboratories, or scientists that corroborate this claim or showcase Turkish Company 1's work. An online search of records hosted by the Internet Corporation for Assigned Names and Numbers (ICANN) showed that the Turkish Company 1 website was registered on August 24, 2022, approximately six months after the Russian invasion of Ukraine, and is hosted in Russia by a major Russian internet hosting company.

40.     A week after U.S. Company 1 directed Chao to send future orders to Turkish Company 1 in Turkey, the U.S. Company 1 Gmail account emailed Chao: "please when are you going to receive anything for stock? We will need to make a first shipment to Turkey to test it."

*As Directed by U.S. Company 1, Biominer Exported Scientific Equipment to Turkey*

41.     After these September 2023 emails, Biominer ceased exporting to Kazakh Company 1 and began exporting similar shipments to Turkish Company 1 at the Istanbul address listed in the email described above in Paragraph 38. Like the shipments to Kazakh Company 1, the shipments from Biominer to Turkish Company 1 included scientific goods and materials that required a license to be exported to Russia but not to Turkey. According to AES data, Biominer shipped scientific goods to Turkish Company 1 five times between October 12, 2023, and April 30, 2024.

42.     In connection with one of these shipments to Turkish Company 1, a U.S. freight forwarder transporting the shipment emailed Chao in December 2023 to request more information about the shipment. The same day, Chao, copying the U.S. Company 1 Gmail account, sent the freight forwarder an invoice for the items between Biominer and Turkish Company 1 and a form authorizing the freight forwarder to transmit EEI to the U.S. government on behalf of Biominer. The form, signed by Chao, certified that Biominer was providing necessary documentation for the

freight forwarder to accurately transmit the information to the U.S. government and acknowledged that criminal penalties could be imposed for making false statements. A few days later, Chao, again copying the U.S. Company 1 Gmail account, sent the freight forwarder a Form BIS-711, which is a form informing BIS about the foreign buyer or ultimate consignee of U.S. products and how the products will be used. The form listed Turkish Company 1 as the ultimate consignee for the shipment, stated that Turkish Company 1 and Biominer had had a business relationship for 10 years, and stated that the items in the shipment would be used by Turkish Company 1 in Turkey and would not be reexported. Chao signed the form for Biominer immediately above the following statement: "We acknowledge that the making of any false statements or concealment of any material fact in connection with this statement may result in imprisonment or fine, or both and denial, in whole or in part, of participation in U.S. exports and reexports."

43. In connection with another shipment to Turkish Company 1, a U.S. freight forwarder transporting the shipment emailed Chao in February 2024 to request a Shipper's Letter of Intent (SLI) and a commercial invoice for the shipment. The same day, Chao replied with no text in the body of the email, suggesting that the email likely included the requested documents as attachments. Later in the same chain, the freight forwarder emailed Chao that the package would need to be sent as a hazardous shipment. Chao forwarded the email chain to the U.S. Company 1 Gmail account. The U.S. Company 1 Gmail account responded to Chao and instructed him to tell the freight forwarder that the shipment was not dangerous. The same day, Chao agreed to do so.

44. In April 2024, the U.S. Company 1 Gmail account emailed Chao that "[w]e tried to pay" Chao $38,880.07 through another company and asked if Chao had received the money. The same day, Chao responded with a summary of unpaid invoices. The next day, the U.S. Company 1 Gmail account replied to Chao that "we paid you about $40,000 last week" and asked whether

17

Chao had received the money and what Chao would be sending. The email also said that "it is now very difficult to ship goods from the United States to Turkey," and that "we would like to see how the first package goes and if everything is fine, then we are ready to pay" more. Later that day, Chao replied to ask whether an international package delivery service might be a way to ship to Turkey. Chao's email also summarized the fulfillment status of several orders, stated that he had received the $38,880.07 payment, and said he had enough funds to order more items.

45. Commercially available foreign export records show that, shortly after Biominer shipped items to Turkish Company 1, Turkish Company 1 shipped similar items to Russia. For example, AES records show that Biominer sent a shipment listed as containing items with HS code 3926909910, which is the U.S. HS code for laboratory ware, to Turkish Company 1 in Turkey on October 12, 2023. Commercially available foreign export records show that Turkish Company 1 sent three shipments listed as containing items with HS code 3926909709, which is the Russian HS code for plastic articles, to Russian Company 2 in Moscow, Russia on October 25 and November 20, 2023.

46. After April 30, 2024, Biominer continued to ship to the same Istanbul address for Turkish Company 1, but changed the name of the ultimate consignee to another company (Turkish Company 2). According to AES data, Biominer shipped to Turkish Company 2 six times between May 27, 2024, and October 4, 2024.

*Scientific Equipment that Biominer Sent to Kazakhstan and Turkey Required a License to Export to Russia*

47. Between November 3, 2022, and March 5, 2025, Biominer sent 30 shipments to Kazakh Company 1, Turkish Company 1, and Turkish Company 2 that required a license to be exported to Russia, which neither Biominer nor Chao obtained. According to the license

18

determination I obtained using the invoices that accompanied each of these exports by Biominer, at least one item in each shipment was captured in paragraphs (e) or (f) of Supplement No. 6 to 15 C.F.R. part 746, meaning that they required a license for export, reexport, or transfer to Russia.

48. According to a neuroscience and biology expert I consulted, these items include parts and consumables for mass spectrometry equipment with strategic applications in the field of chemical weapons, including testing the purity of substances that could be used in chemical weapons and measuring human exposure to chemical weapons.

*Law Enforcement Tracking of a U.S. Company 1 Shipment*

49. On February 5, 2024, HSI and BIS inspected a U.S. Company 1 shipment awaiting export to Turkish Company 1 at the Royal Air Maroc cargo facility at the Washington Dulles Airport in Dulles, Virginia. The shipment included 44 pieces of scientific equipment listed on the bill of lading under HTS code 9027.30.4080, which is the HTS code for electrical spectrometers and spectrographs.

50. Suspecting that U.S. Company 1 was likely transshipping these goods to Russia, HSI and BIS placed an electronic tracking beacon on the shipment which monitored its international movement. The beacon indicated that, as anticipated by the shipping plan, the shipment arrived at a cargo warehouse at the Istanbul International Airport on February 15, 2024. However, on February 19, 2024, it was moved to a different cargo warehouse at the airport and, the following day, was flown to the Sheremetyevo-A.S. Pushkin International Airport in Moscow, Russia, arriving in the early morning hours of February 21, 2024.

## CONCLUSION

51. Based on the facts above, I respectfully submit that there is probable cause to believe that from approximately May 2022 through and including at least January 2025, in the Eastern District of Virginia and elsewhere, Chao violated 50 U.S.C. § 4819 by conspiring with Individual 1, Russian Company 2 Employee, and others known and unknown to violate ECRA and the EAR, including the EAR Russia Sanctions.

Respectfully submitted,

CHRISTOPHER SILVA
Digitally signed by CHRISTOPHER SILVA
Date: 2025.04.08 10:29:27 -04'00'

Christopher Silva
Special Agent
U.S. Department of Commerce
Office of Export Enforcement

Respectfully submitted and attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on April 9, 2025.

/s/ LRV
Lindsey Robinson Vaala
United States Magistrate Judge

Honorable Lindsey R. Vaala
UNITED STATES MAGISTRATE JUDGE