IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | |
| CHI MING CHAO | Case No. 1:25-CR-169-PTG |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

In accordance with *United States v. Booker*, 543 U.S. 220 (2005), 18 U.S.C. § 3553, and the United States Sentencing Guidelines ("Guidelines"), Mr. Chi Ming Chao ("Mr. Chao"), by and through undersigned counsel, respectfully submits this memorandum to aid the Court in determining an appropriate sentence in this case. Considering the unique circumstances of this case and Mr. Chao's personal background, Mr. Chao, through counsel, respectfully submits that a sentence of probation, with a term of home confinement, will fulfill the Court's sentencing obligations of imposing a sentence that is not "greater than necessary" to comply with the statutory goals of sentencing. *See* 18 U.S.C. § 3553(a).

## I.    LEGAL FRAMEWORK FOR DETERMINING AN APPROPRIATE SENTENCE

Section 3553(a) requires the Court to impose a sentence that is "sufficient but not greater than necessary" to satisfy the statutory goals of sentencing after making an "individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (citing *Rita v. United States*, 551 U.S. 338 (2007)). First, the Court must begin its analysis by correctly calculating the advisory sentencing guideline range. Then, in light of the other statutory sentencing

factors, the Court is free to impose a different sentence that is sufficient, but not greater than necessary, to comply with the goals of sentencing. *See Rita*, 551 U.S. at 350-51. To do this, the Court is directed to consider specific factors set out in 18 U.S.C. § 3553(a). These factors include the nature and circumstances of the offense, the defendant's characteristics, the types of sentences available, the sentence prescribed under the guidelines, and the need to avoid unwarranted disparity among similarly situated defendants. *Id.*

## II.    MR. CHAO'S BACKGROUND

Mr. Chao's paternal grandfather fought in the Chinese Civil War. He suffered an injury to his leg, which led to permanent disability. His grandfather became a war refugee and fled to Taiwan with his family, including Mr. Chao's father, and nothing but a suitcase. Despite the family having no friends or family in Taiwan and beginning their life in a refugee camp, Mr. Chao's father was able to work hard enough to finish school and become an art teacher. Mr. Chao's mother's family was already living in Taiwan. But they faced hardships as well. In the 1960s, the government confiscated most of the family's farmland for building projects. Mr. Chao's maternal grandparents were both illiterate, but Mr. Chao's mother was able to finish high school, a significant accomplishment at the time. In 1969, Mr. Chao's parents met each other through a matchmaker. Being a teacher was considered a "good" career, and Mr. Chao's mother's family welcomed his father despite the discrimination that many native-born Taiwanese harbored against mainland refugees.

Mr. Chao's parents were married in 1970. His mother had always wanted to attend college, but gave up that dream to raise four children. His father's income was barely enough to feed the family, which included his grandmother. Mr. Chao's father took on other jobs, and his mother started a pawn shop business in their home. The family's monetary issues were made more difficult

by the fact that Mr. Chao's eldest sister, I-Ching, had severe cognitive disabilities. When I-Ching was very young, the family sent her to live with relatives in a rural area. The family believes that relatives there used folk remedies to help calm I-Ching, which resulted in lead poisoning.

The family first lived in Keelung, a small harbor village. The neighborhood was economically challenged. The house was situated near an open sewer, and many of the neighborhood's residents engaged in gambling and drinking. The family lived in a small 500-square-foot house. Despite its size, the house had luxuries that many homes in the neighborhood lacked, including indoor plumbing and a functioning window-mounted air conditioning unit. Most of the people who lived near the Chao's had minimal education. Because Mr. Chao's mother was literate, people often came to her for help with the paperwork involved in daily life. This provided an additional source of income. Eventually, the family saved enough money to move to Hsinchu.

Life in Hsinchu was a marked improvement. The family of six still lived in a small home, but the area was a hub of education and manufacturing. There was, however, also a major chemical plant that caused severe air pollution. In the 5th or 6th grade, Mr. Chao developed sinusitis and polyps that caused difficulty breathing. While demonstrations led to the closure of the chemical factory, the air pollution from other manufacturing remained. The polyps severely affected Mr. Chao's early studies by interfering with his sleep. The family was finally able to move to the suburbs, where Mr. Chao began to live an easier childhood. His mother cooked and helped him with schoolwork. He was able to play outside, and this experience sparked his love of science. He would borrow every book he could from the library on a wide variety of subjects. He particularly admired scientists and inventors who made considerable contributions to changing human life, and aspired to become a scientist in the future. The seeds of Mr. Chao's future career took root in those early years. He would occasionally visit the garbage dump to collect scrap metal and paper for

recycling, earning a small amount of money. Then, he would use that money to purchase circuit boards, drill bits, iron, and various electronic components. He would also collect usable parts, gears, and motors from discarded toys and use them to create automatic devices, electronic locks, Geiger counters, microscopes, telescopes, projectors, and radios.

Mr. Chao's schooling became more intense, and the pressure of the exams needed to enter senior high school started to generate anxiety. Mr. Chao stayed up late and woke up early every day to study for daily mock exams. Both school and family instilled in him the need for academic qualifications. Without further education, he believed his future would be bleak. In Mr. Chao's world, diplomas were paramount. Many people were willing to retake the exam multiple times to gain admission to their first-choice school. Because his grades were never the best, he needed to attend "cram" schools and study with tutors to ensure that he could further his education. This intense pressure led briefly to suicidal thoughts. Despite having to take on extra academic work, Mr. Chao still found time to devote to science. In his third year of junior high school, while others were solely focused on entrance exams, Mr. Chao signed up for a science fair modeled on the Westinghouse Science Prize and placed second.

Mr. Chao was able to refocus himself and obtain entrance into Hsinchu Senior High School. While there, he participated in a gifted program at Academia Sinica. This further increased his academic curiosity. For the next three years, Mr. Chao spent most weekends, as well as winter and summer vacations in Taipei, learning about the latest biotechnology and dreaming of creating various beneficial organisms through biotechnology. During the school year, he also actively participated in multiple science competitions and experimental design, winning many competitions. Around the same time, NASA established a program that encouraged students to participate in designing space experiments. Similarly, Taiwan also collected feasible experimental

projects from high school students nationwide and awarded substantial prizes. Hundreds of designs were submitted, with the top four receiving awards. Two of Mr. Chao's designs won prizes. As a result, the awards ceremony attracted reporters and was featured on television and in newspapers. Shortly after, Mr. Chao was admitted to National Taiwan University ahead of schedule thanks to his biology experimental paper at Academia Sinica.

Mr. Chao graduated from National Taiwan University and secured a position at the Academia Sinica program, where he had studied during his high school years. He worked on marine organism surveys and environmental impact assessment. While there, he authored his first academic paper. Mr. Chao and his family were growing tired of Taiwan. Environmental pollution was rampant, and food-borne illnesses and cancer, as well as undiagnosed ailments, affected many of their acquaintances and friends. Several people whom his mother had helped train as yoga instructors undermined her business and poached her students. Mr. Chao's father, who was from mainland China, was worried that the verbal attacks perpetrated by various political movements that arose in the aftermath of the end of martial law in 1987. Matters became more complicated in 1995 when tensions between Taiwan and China led many people to believe that China would invade.

In 1995, the family applied for permission to immigrate to Canada. Canada approved their application, and they settled in Vancouver in 1996. Mr. Chao's grandmother and one sister stayed behind in Taiwan. Mr. Chao was eventually accepted into graduate school at the University of South Florida. Mr. Chao worked on distributed data mining in the computer science department. As a teaching assistant, he also helped instruct students in Ada, a computer programming language designed for the Department of Defense and NASA. Several of his students went on to become computer programmers at the Department of Defense. As the Human Genome Project neared its

end, Mr. Chao turned his attention to a new interdisciplinary field, Bioinformatics. The University of South Florida did not have enough resources in the field, so Mr. Chao applied to Rutgers's computational molecular biology program. He secured a fellowship there and moved to New Jersey in 2000. But the program did not work out as promised. Rutgers did not have the resources for him to continue with his work, so Mr. Chao again switched fields. He became a programmer working with the Protein Data Bank. Funding to that project began to run dry, and by 2003, the project could no longer support Mr. Chao's studies.

Mr. Chao returned to Canada, but job opportunities were scarce. He started his own consulting and computer services business. In 2006, he secured a position as a systems analyst at Genewiz, a company specializing in DNA sequencing. In 2009, the owner of Seqgen offered Mr. Chao a job as a field service engineer. Mr. Chao advanced in the company. He had to pull back because of the birth of his first child, and Seqgen laid him off in 2012. In 2013, he returned to work at Genewiz. At the age of 40, and with a family to support, Mr. Chao was no longer interested in pursuing academic research. He set aside his grand plans for scientific discovery and focused on earning a living.

While working for Genewiz, Mr. Chao began developing his own equipment and laboratory servicing business. In 2020, the COVID pandemic brought everything to a standstill. He was unable to travel to visit customers and repair their equipment. Mr. Chao developed a plan. He purchased an RV and traveled to see his clients. Mr. Chao's business grew, and he shepherded his family through the pandemic. Until his arrest on these charges, life had been proceeding relatively smoothly.

Mr. Chao came from humble beginnings. He overcame setbacks and challenges to build a successful business and a loving family. He has made significant contributions to the academic

community, his family, and society as a whole. Mr. Chao humbly urges the Court to balance all the good he has done for the world against the crimes to which he has admitted. There is nothing in Mr. Chao's background that would lead the Court to believe that he would ever run afoul of the law again.

### III.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Chao does not dispute the facts in that narrative and takes full responsibility for his actions. However, the Court should examine closely the actual actions Mr. Chao took. Mr. Chao had been selling various items through his company to his customers for several years. Those customers then could no longer purchase them because of the sanctions, and they asked Mr. Chao to ship them to different locations. Mr. Chao, however, was not trying to help anyone or any organization create chemical or biological weapons. In fact, "[T]he types of goods that CHAO, via Biominer, exported to Kazakh Company 1 after the EAR Russia Sanctions took effect remained consistent with the pre-sanctions shipments to Moscow that now required a license to ship to Russia due to the BIS export restrictions." Statement of Facts ¶ 10. The chemicals and the equipment themselves were not illegal. They had utility for instrument calibration, pharmaceutical research, biology, cosmetic products, plastic making, and food testing.

Mr. Chao had been selling to Individual 1 for many years, since Individual 1 purchased equipment that Mr. Chao had been selling on eBay. Initially, the destination addresses were in Delaware and Chantilly, Virginia. Individual 1 claimed that the location was his laboratory. He later asked Mr. Chao to ship directly to Russia. Individual 1 handled the paperwork and arranged for the shipping company. In 2022, after the Russian-Ukrainian war broke out, Individual 1 explained that he had set up a company in Kazakhstan, and Mr. Chao should ship his goods there. This should have set off alarm bells and prevented Mr. Chao from continuing to do business with

this customer. He should not have taken the steps he did to continue exporting material, but he was not part of a conspiracy to create weapons and provide military equipment.

Mr. Chao is taking responsibility for breaking the law. Given his past relationship with Individual 1, he clearly should have known what was happening. He shipped the goods, and he was responsible for knowing the laws that regulated those shipments. But this is not a case of an individual conspiring with individuals to sell military grade equipment to a state sponsor of terrorism. Mr. Chao was dealing with a customer he had dealt with for some time. There is no accusation that Mr. Chao was in the business of selling illegal weapons or chemicals. There is no accusation that Mr. Chao was actively trying to help Russia upgrade its military capabilities.

## IV.    THE GUIDELINES CALCULATION

The Pre-Sentence Report ("PSR") filed in this case recommends an advisory guideline offense level of 21. It arrives at this total by applying the base level offense of 26 found in U.S.S.G. § 2M5.1(a)(1). The PSR subtracts two levels because Mr. Chao qualifies as a zero-point offender pursuant to § 4C.1. The PSR then applies a cumulative 3-level reduction for acceptance of responsibility under §§ 3E1.1(a) and (b). Mr. Chao does not object to this calculation. While the calculation is correct, the Court has reasons to depart and vary from the guidelines.

1.    Comment 3 to § 2M5.1 should recommend a downward departure in this matter.[1]

The guidelines themselves recognize that a departure may be warranted.

---

[1] The 2025 version of the Guidelines indeed eliminates this ground for a departure. Normally, the version of the Guidelines in use at the time of sentencing is the version the Court is to use. U.S.S.G. § 1B1.11(a). If, however, use of a version of the Guidelines would create an ex post facto issue, then the Court is to use the version of the Guidelines in place at the time the offense was committed. U.S.S.G § 1B11(b)(1). Eliminating a stated ground for departure creates such an issue. "Retroactively removing a basis for downward departure, as the amendment to § 5K2.20 has done, exhibits every element of an ex post facto violation." *United States v. Schnepper*, 302 F.Supp.2d 1170, 1186 (2004) (citing *United States v. Johns*, 5 F.3d 1267, 1271 (9th Cir. 1993)). As such, the earlier version of the Guidelines manual should apply.

"Departure Provisions.—

(A) In General.—In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences. Where such factors are present in an extreme form, a departure from the guidelines may be warranted." § 2M5.1 cmt. 3.

Mr. Chao's case calls for such a departure. Mr. Chao was not as sophisticated as the government makes him out to be. He did not even know how to send items through customs. Initially, the freight company handled customs paperwork and provided Mr. Chao with prefilled forms. But when Mr. Chao had to begin filling out forms himself, he was having trouble. Mr. Chao needed a DHL representative to demonstrate how to complete the necessary paperwork for shipping the items in question. DHL's website and its customer service personnel were able to assist Mr. Chao in filling in the information. He did not have to concoct elaborate schemes to avoid detection.

The government is not asserting that Mr. Chao was actively trying to help a foreign terrorist organization build a chemical weapon. While the items themselves required a license, they also had legitimate scientific applications. The equipment was similar. None of the items Mr. Chao was selling were illegal. Mr. Chao's company was in the business of selling and providing these products for their legitimate purposes, and no one contends that Mr. Chao was actively attempting to sell these products for use in a manner that was dangerous. If an individual were deliberately circumventing the Export Control Act with the goal of the product's end user creating a chemical weapon, the same guideline provision would apply as that applied to Mr. Chao. That is why comment 3 contemplates a departure.

9

2.    <u>The Court Also has Reason to Vary from the Guideline Range</u>

Mr. Chao's conduct violates the statute, and therefore, § 2M5.1 applies. But the guideline is aimed at preventing terrorism. Before 2001, the guideline provision had a base level of 14 and an enhanced level of 22 if a defendant evaded national security or nuclear proliferation regulations. In 2001, the sentencing commission amended § 2M5.1, making significant changes to the guidelines' structure and penalty framework. The amendment introduced an entirely new provision addressing financial transactions with countries that support international terrorism. It also raised the base offense level to 26 from 22 for evading export controls where the goods shipped were subject to national security controls. These changes reflected heightened concerns about terrorism in the aftermath of the September 11, 2001, attacks and expanded the scope of conduct subject to enhanced penalties under the guideline. But in doing so, the sentencing commission also ensnared people whose conduct is not that of people participating in activities supporting terror.

There is an appreciable difference between Mr. Chao selling chemicals he believed to be used in civilian applications and someone who is actively working to help create biological weapons. As the amendments to the guidelines make clear, the primary focus is to ensure that weapons related to terrorism are not sourced from the United States. Recent prosecutions related to evading export controls support this assertion. Cases include *United States v. Zharnovnikov*, No 1:25-CR-45 (E.D.N.Y), which involved the export of firearms and ammunition worth over 1.5 million dollars, *United States v. Flighttime Enterprises*, Inc, No. 1:25-CR-17 (S.D. Ohio) where the defendants exported over 2 million dollars worth of aircraft equipment, and *United States v. Golstev*, 1:23-CR-452 (E.D.N.Y) where the defendants exported electronics they knew to be destined for use in missiles and drones. The defendants in these cases knew that they were circumventing export controls with the goal of the products being used in a military context. Mr. Chao intended no such harm.

10

When an offense level substantially overstates the seriousness of the actual conduct, even if a particular guideline provision covers the conduct, that is a recognized reason to sentence below the calculated guidelines. *See United States v. Kalili*, 100 Fed.App. 903 (4th Cir. 2004). In *Kalili*, the Fourth Circuit affirmed the District Court's reasoning that a lower sentence than the Guidelines called for was appropriate because the actual monetary harm was significantly less than the value the Guidelines captured. A similar situation exists in this case. § 2M5.1 is specifically designed to capture conduct that aims to harm national security. Mr. Chao's conduct violates the statute to which § 2M5.1 applies, but his actual conduct does not represent a purposeful attempt to damage that national security.

## V.    DETERMINING THE APPROPRIATE SENTENCE IN THIS CASE

In determining the appropriate sentence, this court must consider the circumstances of the offense and the defendant's history and characteristics. 18 U.S.C. § 3553(a)(2) also instructs a sentencing court to consider the need for the sentence imposed to (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; **(**C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. These factors all counsel in favor of a sentence of probation, albeit with a period of home detention.

There is no need for further deterrence for Mr. Chao. He will be a convicted felon for the rest of his life. He must disgorge almost $400,000. This is by far the biggest mistake of his life. Never again will he take any action that could possibly violate the law. By the same token, the public does not need further protection from Mr. Chao. Mr. Chao did not defraud any victims; he did not bring direct harm to any individual. The goods he sold were ones he had been selling before the sanctions went into effect. There is no indication that Mr. Chao knew that they were being used

11

for any illegal or dangerous purpose. The conviction and the stiff monetary penalty he will pay, and whatever terms and special conditions of probation this Court deems appropriate, are enough to deter and punish Mr. Chao. § 3552(a)(2)(D) instructs the Court to consider the needs for education, training, and medical care. Mr. Chao does not require educational or vocational training. His wife, however, does need medical care. As noted in the PSR, ¶ 68, her health issues are ongoing. As of the time of this filing, her doctors have not determined the cause and are continuing their tests. Even with the strictures of home confinement, Mr. Chao would be able to help care for his wife and their three children.

## VI. CONCLUSION

Mr. Chao, through counsel, respectfully submits that a sentence of probation, with a significant term of home confinement, will fulfill the Court's obligation to impose a sentence that is not "greater than necessary" to comply with the statutory goals of sentencing.

Respectfully Submitted,

THE LAW OFFICE OF JESSE WINOGRAD

Date: November 6, 2025

/s/ Jesse Winograd
Jesse Winograd
Virginia Bar # 79778
5335 Wisconsin Ave. NW, Suite 440
Washington, DC 20015
Phone: (202) 302-7429
jwinograd@jwinogradlaw.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Respectfully submitted,

Date: <u>November 6, 2025</u>

/s/ Jesse Winograd
Jesse Winograd, VA Bar #79778